**UNITED STATES  DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

TONY B. GILLET                                                     CIVIL ACTION

VERSUS                                                              NO.  11-2880

JAMES M. LEBLANC, LINDA RAMSAY,                SECTION "G"(4)
ROBERT C. TANNER

## REPORT AND RECOMMENDATION

This matter was referred to a United States Magistrate Judge to conduct a hearing, including

an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for

disposition pursuant to **28 U.S.C. § 636(b)(1)(B) and (C), § 1915(e)(2), and § 1915A**, and as

applicable, **42 U.S.C. § 1997e(c)(1) and (2)**.  On January 12 and February 16, 2012, the Court

conducted hearings pursuant to *Spears v. McCotter*,[1] and its progeny, with the plaintiff and counsel

for the defendants participating by conference telephone call.[2]  Upon review of the entire record, the

Court has determined that this matter can be disposed of without an evidentiary hearing.

---

[1] 766 F.2d 179 (5th Cir. 1985).  The purpose of the *Spears* Hearing is to ascertain what it is the prisoner alleges
to have occurred and the legal basis for the claims.  The information elicited at the hearing is in the nature of an amended
complaint or a more definite statement under Fed. R. Civ. P. 12(e).  *Wilson v. Barientos*, 926 F.2d 480, 482 (5th Cir.
1991).

[2] Rec. Doc. Nos. 16, 21.  The plaintiff was sworn prior to testifying on both occasions.  The Court's digital
recording device failed to record the first hearing.  Rec. Doc. No. 20.  The second hearing was successfully recorded.

# I.  Factual Background

## A.  The Complaint

The plaintiff, Tony B. Gillet ("Gillet"), filed this *pro se* and *in forma pauperis* complaint pursuant to 42 U.S.C. § 1983 against the Secretary James M. LeBlanc of the Louisiana Department of Public Safety and Corrections ("DOC"), Assistant DOC Secretary Linda Ramsay, and Warden Robert Tanner, each in their individual and official capacities.  Gillet alleges that his constitutional rights are being violated by a policy at the B.B. "Sixty" Rayburn Correctional Center ("RCC") which prohibits him from receiving packages and publications by mail.  He also complains that the defendants denied him an adequate administrative grievance procedure ("ARP") and a fair hearing on his challenge to the policy in question.

Gillet alleges that he is housed in RCC under disciplinary detention at a level one lockdown status in the Special Management Unit ("SMU").  He alleges that on September 4, 2010, September 11, 2010, October 2, 2010, February 16, 2011, and March 1, 2011, the mail room at RCC rejected "notices of religious books" under RCC Posted Policy No. 4.  This policy prohibits level one and level two inmates in disciplinary detention from receiving packages or periodicals through the mail, except religious publications through the Chaplain's office.  He further claims that this policy contradicts another written policy in the inmate handbook which allows inmates in disciplinary detention to receive and send correspondence.

Gillet claims that, on September 21, 2010, he filed a grievance complaint, RCC 2010-421, which was denied by Colonel Larry Grow, who without addressing his legal arguments concluded that the Posted Policy No. 4 was not unconstitutional.  Pursuant to the ARP guidelines, Gillet appealed this decision on September 30, 2010, to the Secretary of the DOC.  He received a response

from Assistant Secretary Linda Ramsay in which she indicated that the matter had been reviewed by a specialist and resolved without addressing his specific arguments that no further investigation was warranted and again quoted portions of Posted Policy No. 4 to support the denial of relief.

He claims that he was entitled to a fair and impartial decision on his ARP complaint. He suggests that the responders ignored his constitutional rights under the First, Sixth, Eighth, and Fourteenth Amendments and conspired to deny him review. He also claims that he will suffer irreparable harm as a result of the enforcement of Posted Policy No. 4. He also concedes that he has suffered no physical injury and is not entitled to monetary compensation under the Prison Litigation Reform Act.

As relief, he seeks a formal written apology from the defendants, an order directing Warden Tanner to re-write Posted Policy No. 4 to conform with federal law to allow access to publications through the mail, including books, magazines, periodicals, newspapers, pictures, newsletters, bulletins, fiction or non-fiction, educational, legal, technical or entertaining, and accredited or non-accredited correspondence courses whether extracurricular/fun or regular topics of interest or study. He also seeks an order directing Secretary LeBlanc to hire or the court to appoint a legal analyst to perform paralegal research and litigate the prisoners' ARP appeals. He further asks for the award of costs and $1,500.00 in punitive damages against each defendant.

## B. The *Spears* Hearing

Gillet testified that he is incarcerated as a multiple offender for a 1998 distribution of cocaine conviction for which he received a flat 15 year sentence. He arrived at RCC on February 1, 2010, already on disciplinary lockdown status from the Forcht-Wade Correctional Center, which he believes has been converted into a drug rehabilitation center for non-disciplinary inmates.

At the time of the *Spears* Hearing, he was still on extended lockdown at level two, instead of level one where he was at the time of the filing of his complaint. He had just been before the review board in hopes of being released from disciplinary lockdown to a working cell block. He also indicated that he has been in disciplinary lockdown since his arrival, because of several intervening disciplinary charges which extended him 90 days each time.

Gillet testified that he ordered religious materials from publishers, and the packages were rejected by RCC officials based on SMU Posted Policy No. 4. This policy, he stated, does not allow inmates on disciplinary levels one or two to receive packages or periodicals of any kind. He believes that, if he were on a working cell block, he would be able to order books and receive packages.

He complained that SMU Posted Policy No. 4 is an overly broad, blanket policy that prevents all packages and periodicals without concern for what it is. He also indicated that DOC Policy C-02-009 sets forth different rules on correspondence and packages received by inmates. He suggests that this policy is supposed to cover all inmates and conflicts with SMU Posted Policy No. 4. He claims that paragraph 10(b) of the DOC policy only allows the prison to refuse packages if it interferes with safety matters at the prison. He also claims that the prison's rules allow inmates in disciplinary detention to receive and originate correspondence. He contends that books and packages are types of correspondence, and although he is in a restricted cell block, he still should be allowed to receive this type of correspondence.

Gillet stated that he sued Secretary James LeBlanc as the supervisor over Linda Ramsay, the person who replied to his second step grievance form. Although he was not sure that LeBlanc knew about his grievance, he contends that it was his job to know as the boss and supervisor. He claims

that he filed the grievance giving great factual and legal detail. In spite of this, Ramsay denied him relief by simply referring back to the prison's policy without addressing his individual arguments. This, he alleged, was not a fair or impartial response and indicated her lack of knowledge as to her job. He claims that her failure to grant him relief was the result of LeBlanc's failure to properly train and supervise her. He also sued Ramsay for her poor response on the basis that she failed to properly review his claims. He contends that her failure to award him relief could only have been the result of her failure to review his allegations and the applicable law.

Gillet also testified that he sued Warden Tanner, because, as the warden of RCC he appointed Larry Grow to answer the first level of the ARP process. He claims that Grow was not qualified to address the claims raised. He also alleged that Tanner should have been aware of his problems, because he wrote many letters to him. He also claims that Tanner should have better supervised Grow in how to properly answer the ARP.

## II.     Standards of a Review for Frivolousness

Title 28 U.S.C. §§ 1915A and 42 U.S.C. §§ 1997e(c) require the Court to *sua sponte* dismiss cases filed by prisoners proceeding *in forma pauperis* upon a determination that they are frivolous. The Court has broad discretion in determining the frivolous nature of the complaint. *See Cay v. Estelle*, 789 F.2d 318 (5th Cir. 1986), *modified on other grounds*, *Booker v. Koonce*, 2 F.3d 114 (5th Cir. 1993). However, the Court may not *sua sponte* dismiss an action merely because of questionable legal theories or unlikely factual allegations in the complaint.

Under this statute, a claim is frivolous only when it lacks an arguable basis either in law or in fact. *Neitzke v. Williams*, 490 U.S. 319 (1989); *Talib v. Gilley*, 138 F.3d 211, 213 (5th Cir. 1998).

A claim lacks an arguable basis in law if it is based on an indisputably meritless legal theory, such as if the complaint alleges the violation of a legal interest which clearly does not exist. *Harper v. Showers*, 174 F.3d 716, 718 (5th Cir. 1999). It lacks an arguable factual basis only if the facts alleged are "clearly baseless," a category encompassing fanciful, fantastic, and delusional allegations. *Denton v. Hernandez*, 504 U.S. 25, 32-33 (1992); *Neitzke*, 490 U.S. at 327-28. Therefore, the Court must determine whether the plaintiff's claims are based on an indisputably meritless legal theory or clearly baseless factual allegations. *Reeves v. Collins*, 27 F.3d 174, 176 (5th Cir. 1994); *see Jackson v. Vannoy*, 49 F.3d 175, 176-77 (5th Cir. 1995); *Moore v. Mabus*, 976 F.2d 268, 269 (5th Cir. 1992).

III.     **Claims Against Defendants In Their Official Capacities**

Gillet seeks damages and injunctive relief against each of the defendants to redress his § 1983 claims that he was unconstitutionally denied the ability to receive packages and publications based on the policies in place over the SMU section of the prison. Gillet has named the defendants, LeBlanc, Ramsay, and Tanner, each in their official and individual capacities. For the following reasons, the claims against them in their official capacities are barred by the Eleventh Amendment immunity doctrine and are otherwise frivolous.

A.     **Claims Seeking Monetary Relief are Barred by the Eleventh Amendment**

Section 1983 provides a federal cause of action against any person who, acting under color of state law, deprives another of his constitutional rights. 42 U.S.C. § 1983. A plaintiff must prove both the constitutional violation and that the action was taken by a "person" under color of state law. *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 156 (1978); *Polk County v. Dodson*, 454 U.S. 312 (1981). However, a state actor in his official capacity is not considered to be a person for purposes of suit

under § 1983.  *Will v. Michigan Dept. of St. Police*, 491 U.S. 58 (1989); *Stotter v. University of Texas*, 508 F.3d 812, 821 (5th Cir. 2007).  In keeping with its long-standing doctrine, the Supreme Court has held that, when a state actor is sued in his official capacity, the action is considered to be one taken against the department he represents.  *See Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978).

In this case, the defendants are employed by the DOC, which is a department within the Louisiana state government.  La. Rev. Stat. Ann. § 36:401.  For Eleventh Amendment purposes, the DOC is considered an arm of the state since any money judgment against it or its subdivisions necessarily would be paid from state funds.  *Anderson v. Phelps*, 655 F. Supp. 560, 564 (M.D. La. 1985).  Therefore, suit against the State, the DOC, and its employees in their official capacities implicates the Eleventh Amendment immunity doctrine.  *Muhammad v. Louisiana*, No. 99-2694 c/w 99-3742, 2000 WL 1568210, at *3 (E.D. La. Oct. 18, 2000); *Citrano v. Allen Correctional Center*, 891 F. Supp. 312, 320 (W.D. La. 1995) ("A suit against any state correctional center would be suit against the state and therefore barred by the Eleventh Amendment.") (citing *Anderson*, 655 F. Supp. at 560 and *Building Engr. Serv. Co., Inc. v. Louisiana*, 459 F. Supp. 180 (E.D. La. 1978)).

The Eleventh Amendment forbids federal courts from entertaining a suit for monetary damages brought by a citizen against his own State.  *Pennhurst State School v. Halderman*, 465 U.S. 89, 98 (1984); *Voisin's Oyster House, Inc. v. Guidry*, 799 F .2d 183, 185-86 (5th Cir.1986).  A state may expressly waive this Eleventh Amendment sovereign immunity. See *Edelman v. Jordan*, 415 U.S. 651, 673 (1974) (holding that a state's consent to suit against it in federal court must be expressed "unequivocally"); *Welch v. Dept. of Highways*, 780 F.2d 1268, 1271-73 (5th Cir.1986).  However, the State of Louisiana has not done so.

To the contrary, La. Rev. Stat. Ann. § 13:5106(a) provides that "no suit against the state . . . shall be instituted in any court other than a Louisiana state court." Accordingly, the Court is without jurisdiction to hear the plaintiff's claims for monetary relief against the State of Louisiana, the DOC, or the named defendants in their official capacities. *See Warnock v. Pecos County, Tx.*, 88 F.3d 341, 343 (5th Cir. 1996). These claims must be dismissed as frivolous for lack of jurisdiction, for failure to state a claim for which relief can be granted, and/or for seeking monetary relief against immune defendants in accordance with § 1915(e), § 1915A, and § 1997e.

**B.      Claims Seeking Prospective Injunctive Relief are Frivolous**

Gillet also seeks prospective injunctive relief against the defendants in their official and individual capacities to have the package and publication policy in the SMU rectified to comply with federal law and to allow him to receive packages while housed therein. The Eleventh Amendment does not protect state officials from claims for prospective injunctive relief when it is alleged that the state officials are acting in violation of federal law. *Ex Parte Young*, 209 U.S. 123, 155-56 (1908); *Edelman*, 415 U.S. at 664; *Brennan v. Stewart*, 834 F.2d 1248, 1252 (5th Cir. 1988). To meet this exception in its application to a § 1983 suit, a plaintiff's suit alleging a violation of federal law must be brought against individual persons in their official capacities as agents of the state, and the relief sought must be declaratory or injunctive in nature and prospective in effect. *See Saltz v. Tenn. Dept. of Employment Sec.*, 976 F.2d 966, 968 (5th Cir. 1992). Thus, while declaratory and prospective injunctive relief can not be pursued against the State in federal court, it can be pursued against a state official sued in his official capacity.

In this case, Gillet has alleged enough factual basis to meet his initial burden of overcoming the Eleventh Amendment immunity bar under *Ex Parte Young* to bring this action against the named

defendants in their official capacities.  Nevertheless, for the reasons that follow in the next section

of this report, SMU Posted Policy No. 4 is not unconstitutional.  For that reason, his claims seeking

injunctive relief against the defendants in their official capacities based on the allegation that the

SMU Posted Policy No. 4 is unconstitutional are also frivolous and fail to state a claim for which

relief can be granted and should be dismissed under §1915 and § 1915A for the reasons that follow.

**IV.**     **Claims Against the Defendants in Their Individual Capacities**

Gillet has also named each of the defendants, LeBlanc, Ramsay, and Tanner, in their

individual capacities in connection with the administrative grievance process and the resulting

approval of the enforcement of SMU Posted Policy No. 4 against him.  For the following reasons,

his claims against the defendants, each in their individual capacities, also are frivolous and otherwise

fail to state a claim for which relief can be granted.

**A.**     **SMU Posted Policy No. 4 is not Unconstitutional**

Gillet alleges that SMU Posted Policy No. 4 violates his First Amendment right to free

speech by denying his ability to obtain packages and publications through the mail,[3] his Eighth

Amendment right to be free from cruel and unusual or excessive punishment caused by the other

constitutional violations,[4] and his Fourteenth Amendment right to a fair and impartial hearing prior

to restricting his right to receive packages and publications.  He complains that SMU Posted Policy

No. 4 prevents him from receiving packages which can be received by other inmates and because

it also prevents him from receiving all publications through the mail.  Citing *Turner v. Safley*, 482

---

[3]Rec. Doc. No. 1, p. 12, ¶1.

[4]*Id.*

U.S. 78 (1987), he alleges the policy to be unrelated to any legitimate penological interest or an exaggerated response to such an interest.

Gillet relies on two specific prison policies to support his complaint. The first policy, DOC Regulation C-02-009, separately and specifically defines "publications" as a "book, booklet, pamphlet, or similar document, or a single issue of a magazine, periodical, newsletter, newspaper, magazine/newspaper clipping, article printed from the internet, plus other materials addressed to a specific inmate such as advertising brochures, flyers, and catalogs."[5] The regulation also provides specific rules for publications, distinct from other types of "correspondence," which are indicated to be "letters."[6] The regulation provides in relevant part as follows:[7]

9.    PROCEDURES FOR PUBLICATIONS:
A.    Publications (see definition in Section 6.F.) may be read and inspected to discover contraband and unacceptable depictions and literature. Unless otherwise provided by the rules of the institution, all printed matter must be received directly from the publisher. Multiple copies of publications for any one individual inmate are not allowed. Samples inserted in publications will be removed prior to delivery. Upon the effective date of the Canteen/Package initiative, books must be purchased through the canteen and will no longer be allowed to be sent through the mailroom.
B.    Newspaper and magazine clippings (xerox copies allowed) as well as articles printed from the internet are considered publications for the purpose of review pursuant to this regulation. However, they are not required to originate from the publisher. A limit of five clippings/articles may be received within a piece of regular correspondence and the quantity received may be further limited by what can be reasonably reviewed for security reasons in a timely manner. Multiple copies of the same clippings/articles for any one individual inmate are not allowed. Inclusion of clippings/articles in regular correspondence may delay the delivery.
C.    Refusal of Publications: Printed material shall only be refused if it interferes with legitimate penological objectives (including but not limited to

---

[5]Rec. Doc. No. 22-4, Department Regulation C-02-009, dated 1/5/07.

[6]*Id.*, p. 3, ¶8.

[7]*Id.*, p. 10, ¶9.

deterrence of crime, rehabilitation of inmates, maintenance of internal/external security of an institution or maintenance of an environment free of sexual harassment), or if the refusal is necessary to prevent the commission of a crime or to protect the interests of crime victims. This would include but not be limited to the following described categories:

1) Security issues:
   a. Maps, road atlas, etc. that depict a geographic region that could reasonably be construed to be a threat to security;
   b. Writings that advocate, assist or are evidence of criminal activity or facility misconduct;
   c. Instructions regarding the ingredients or manufacturing of intoxicating beverages or drugs;
   d. Information regarding the introduction of, or instructions in the use, manufacture, storage, or replication of weapons, explosives, incendiaries, escape devices or other contraband;
   e. Instructs in the use of martial arts;
   f. Racially inflammatory material or material that could cause a threat to the inmate population, staff, and security of the facility;
   g. Writings which advocate violence or which create a danger within the context of a correctional facility.

In addition to the above DOC policy, RCC has its own more restrictive policy applicable to the SMU level one and two disciplinary cellblocks. That policy, SMU Posted Policy No. 4, provides in relevant part as follows with regard to inmates like Gillet:[8]

*General*
[. . .]
Indigent Materials/Correspondence
[. . .]
14. Offenders are allowed to write and send out correspondence. Indigent offenders can only mail two letters a week. Offenders cannot receive packages or periodicals.
[. . .]
Extended Lockdown - Level 1
[. . .]
Permitted Property
[. . .]
43. Offenders are allowed the following items: [. . .]

---

[8]Rec. Doc. No. 22-1, pp. 1, 2, 14, 15, 16, 17, RCC Special Management Unit Offender Posted Policy No. 4, dated 6/17/09.

- Two books

[. . .]

<u>Extended Lockdown - Level 2</u>

[. . .]

<u>Permitted Property</u>

[. . .]

57.     Offenders are allowed the following items: [. . .]

- Three books

[. . .]

These policies do not conflict with each other. The DOC policy, applicable to the general population of DOC inmates in all DOC facilities, allows for the inmates to receive publications as restricted therein. It appears from that regulation that, since the effective date of that policy on January 5, 2007, the DOC was implementing a separate "Canteen/Package Initiative." This initiative was to supercede the publication policy to require, on its effective date, that "books must be purchased through the canteen and will no longer be allowed to be sent through the mailroom."[9] This initiative/policy has not been mentioned or challenged by Gillet.

The specific policy for level two inmates posted by RCC for the SMU cellblock prohibits the inmates therein from receiving packages and periodicals. It is truly this provision which forms the basis of Gillet's challenge in this Court.

Gillet conceded at the *Spears* Hearing that the challenged policy is specific to and part of the restriction of privileges imposed upon the level one and two disciplinary inmates housed in SMU. He complains that the more general policy, DOC Regulation C-02-009, allows other inmates to receive certain packages and that it is not appropriate for that right to be impinged by the more restrictive policy, SMU Posted Policy No. 4. He understands, however, that the policy is imposed upon those inmates who already pose a safety problem for the prison. He contends, instead, that this

---

[9]Rec. Doc. No. 22-4, pp. 1, 10.

is a harsh punishment, even though it applies to inmates on extended lockdown, under the Eighth Amendment and an infringement on his First Amendment right to buy the periodicals and books of his choice without some additional due process as required by the Fourteenth Amendment.

It is well settled that "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989). For this reason, "even though this court engages in a deferential review of the administrative decisions of prison authorities, the traditional deference does not mean that courts have abdicated their duty to protect those constitutional rights that a prisoner retains." *Fortner v. Thomas*, 983 F.2d 1024, 1029 (11th Cir. 1993). In this case, however, a review of Gillet's claims about SMU Posted Policy No. 4 discloses no constitutional violation under the First, Eighth, or Fourteenth Amendments for the following reasons.

## 1.    The Policy Does Not Violate the First Amendment

Gillet alleges that he has a First Amendment right to freedom of speech which provides him the right to secure publications from the publisher at a minimum for education, rehabilitative and religious pursuits. Even under a broad reading, Gillet does not urge his claims under any other protected right in the First Amendment except his right to free speech.

"[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). Among other things, the "Constitution protects the rights to receive information and ideas." *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972).

To recover under § 1983 for a claim that a prison policy violated this First Amendment right, the prisoner must make a showing that the restriction was not reasonably related to legitimate

penological interests. *Turner*, 482 U.S. at 89; *Cooper v. Schriro*, 189 F.3d 781, 784 (8th Cir. 1999). The Supreme Court has held that prison rules and policies restricting a prisoner's constitutionally protected rights must be "reasonably related to legitimate penological interests." *Id.* A court must engage in a subjective consideration of the policy and the proposed basis for the policy (legitimate penological interest) in addressing whether a prison policy violates the constitution. *Id.*

In determining whether a regulation or restriction is reasonable, the court employs a balancing test considering the following factors: (1) whether a rational connection exists between the regulation and a neutral, legitimate government interest; (2) whether alternative means exist for inmates to exercise the constitutional right at issue; (3) what impact the accommodation of the right would have on inmates, prison personnel, and allocation of prison resources; and (4) whether obvious, easy alternatives exist. *Beard v. Banks*, 548 U.S. 521, 528 (2006) (reiterating the holdings in *Turner* and *Overton v. Bazzetta*, 539 U.S. 126, 137 (2003), in upholding a prison policy denying newspapers, magazines and photographs to a group of "specifically dangerous and recalcitrant inmates."); *Turner*, 482 U.S. at 89.

The *Beard* Court found that there were several justifications for the prison's policy that denied newspapers, magazines, and photographs "to a group of specially dangerous and recalcitrant inmates." *Beard*, 548 U.S. at 524-25. The Court noted that these justifications included "the need to motivate better behavior on the part of particularly difficult prisoners, the need to minimize the amount of property they control in their cells, and the need to ensure prison safety, by, for example, diminishing the amount of material a prisoner might use to start a cell fire." *Beard*, 548 U.S. at 530. The Court concluded that the first justification was all that was necessary as a legitimate penological objective:

We need go no further than the first justification, that of providing increased incentives for better prison behavior. Applying the well-established substantive and procedural standards set forth in [*Turner* and *Overton*], we find, on the basis of the record before us, that the Secretary's justification is adequate.

*Beard*, 548 U.S. at 530.

In addressing the First Amendment rights of prisoners, the Fifth Circuit has noted that the Supreme Court in *Beard* "acknowledged the particular importance of the first factor, explaining that in some cases the second, third, and fourth factors can 'add little, one way or another, to the first factor's basic logical rationale.'" *Morgan v. Quarterman*, 570 F.3d 663, 666 (5th Cir. 2009) (quoting *Beard*, 548 U.S. at 532). Thus, prison restriction on an inmate's access to publications does not violate his First Amendment rights if the restrictions are reasonably related to legitimate penological interests. *Beard*, 548 U.S. at 530; *Morgan*, 570 F.3d at 666.

Considering these factors and based on his allegations, and the information received in connection with his testimony at the *Spears* Hearing,[10] Gillet has alleged that there was a specific constitutional violation which conflicted with the posted policies at the prison that is not related to a legitimate penological reason. As noted above, Gillet acknowledges that the restriction is imposed as part of the harsher sanctions on those inmates already segregated for their violations of prison rules. He concedes this to be a likely reason for the imposition, although he disagrees with the policy as an impermissible sanction.

In addition, Gillet also recognizes that he is allowed to obtain books, periodicals, and even religious materials from other sources in the prison, including the Chaplain, who was apparently

_____

[10]Rec. Doc. No. 22. The ARP complaints and responses and the statutes referenced in the complaint were mentioned specifically by Gillet in his *Spears* Hearing testimony. These matters, therefore, are properly considered as addendums to the complaint for purposes of the Court's frivolousness review.

given custody of the two "religious" books Gillet ordered.[11]  This is clearly an alternative allowed by the two prison policies at issue and as is conceded by Gillet.  He also is allowed to have prison-supplied books in his cell under SMU Posted Policy No. 4, §§ 43, 57 quoted above.[12]

For these reasons, Gillet's own pleadings and testimony establish that RCC had a legitimate and reasonable basis for the package and publication restrictions imposed on him as a level one and level two disciplinary inmate in SMU.  His claims under the First Amendment are legally meritless and should be dismissed as frivolous and/or for failure to state a claim for which relief can be granted pursuant to § 1915, § 1915A, and § 1997e.  He therefore is not entitled to prospective injunctive relief related thereto against the defendants in their official capacities.

## 2.    The Policy does not Violate the Eighth Amendment

Gillet claims that SMU Posted Policy No. 4 amounts to cruel and unusual or excessive punishment by denying him materials to rehabilitate and educate himself.  The Eighth Amendment's prohibition on "cruel and unusual punishments" forbids conditions of confinement "which are incompatible with 'the evolving standards of decency that mark the progress of a maturing society' . . . or which 'involve the unnecessary and wanton infliction of pain.'"  *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (citations omitted).  "[C]onditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional.  To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society."  *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

---

[11]Rec. Doc. No. 22-1, p. 7, Notice of Rejection: "Mailroom Disposition: DONATED TO CHAP[LAIN] PER OFFENDER CGT."; Rec. Doc. No. 22-1, p. 9, Notice of Rejection: "Mailroom Disposition: DONATED TO CHAP[LAIN] PER OFFENDER CGT."

[12]Rec. Doc. No. 22-1, p. 17.

Manifestations of an explicit policy or restriction like those complained of by Gillet are considered to be "conditions of confinement" which would fall under the Eighth Amendment. *Shepherd v. Dallas County*, 591 F.3d 445, 452 (5th Cir. 2009) (citing *Scott v. Moore*, 114 F.3d 51, 53 n.2 (5th Cir. 1997)). "Prison conditions constitute cruel and unusual punishment if they involve the 'wanton and unnecessary infliction of pain [or if they are] grossly disproportionate to the severity of the crime warranting imprisonment.'" *Hamilton v. Lyons*, 74 F.3d 99, 103-04 (5th Cir. 1996) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981) and citing *Estelle*, 429 U.S. at 103; *Hutto v. Finney*, 437 U.S. 678, 687 (1978)). Like other Eighth Amendment claims, a conditions of confinement claim must satisfy tests for both objective and subjective components. *Davis v. Scott*, 157 F.3d 1003, 1006 (5th Cir. 1998) (citing *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)); *accord Wilson v. Seiter*, 501 U.S. 294, 298-99 (1991); *Downey v. Denton County*, 119 F.3d 381, 385-86 (5th Cir. 1997). To succeed on a claim of unconstitutional conditions of confinement, this Court "must ask if 'the officials act[ed] with a sufficiently culpable state of mind' and if the alleged wrongdoing was objectively 'harmful enough' to establish a Constitutional violation." *Hudson*, 503 U.S. at 8 (quoting *Wilson*, 501 U.S. at 298, 303). If the Court finds that either the subjective or objective component of the test is not met, it need not address the other component. *Davis*, 157 F.3d at 1006.

With respect to the objective component, the Supreme Court in *Wilson* noted that routine discomfort is part of the penalty that convicted prisoners pay for having committed crimes. Therefore, "only those deprivations denying 'the minimal civilized measure of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson*, 501 U.S. at 298 (quoting *Rhodes*, 452 U.S. at 347). "[E]xtreme deprivations are required to make out a conditions-of-confinement claim." *Hudson*, 503 U.S. at 9.

With respect to the subjective component of the test, the Supreme Court has applied a deliberate indifference standard. *Wilson*, 501 U.S. at 303. "Deliberate indifference" means that a prison official is liable "only if he knows that the inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994).

> To establish deliberate indifference in the context of the Eighth Amendment, the prisoner must show that the defendants (1) were aware of facts from which an inference of an excessive risk to the prisoner's health or safety could be drawn and (2) that they actually drew an inference that such potential for harm existed.

*Bradley v. Puckett*, 157 F.3d 1022, 1025 (5th Cir. 1998) (citing *Farmer*, 511 U.S. at 837). "Under exceptional circumstances, a prison official's knowledge of a substantial risk of harm may be inferred by the obviousness of a substantial risk." *Id.* (citing *Farmer*, 511 U.S. at 842 & n.8).

> The Supreme Court has recently reaffirmed that "deliberate indifference" is a <u>stringent</u> standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. . . . The "deliberate indifference" standard permits courts to separate omissions that "amount to an intentional choice" from those that are merely "unintentionally negligent oversight[s]."

*Southard v. Tex. Bd. of Crim. Justice*, 114 F.3d 539, 551 (5th Cir. 1997) (citing *Bd. of County Comm'rs v. Brown*, 520 U.S. 397 (1997)) (other citations omitted) (emphasis added).

The only restriction complained of here arises from the RCC policy prohibiting Gillet from receiving packages and publications while on level one and two disciplinary confinement. These restrictions imposed as part of disciplinary segregation are "not a dramatic departure from accepted standards of conditions of confinement." *Overton v. Bazzetta*, 539 U.S. 126, 137 (2003) (addressing withdrawal of visitation privileges in disciplinary segregation) (citing *Sandin v. Conner*, 515 U.S. 472, 485 (1995)). The restrictions on receipt of packages and publications does not "create inhumane prison conditions, deprive inmates of basic necessities, or fail to protect their health or

safety. Nor does it involve the infliction of pain or injury, or deliberate indifference to the risk that it might occur." *Overton*, 539 U.S. at 137.

There is nothing in Gillet's complaint or testimony which would reach the level of establishing that the restrictions placed upon him were cruel and unusual in violation of the Eighth Amendment as defined by the Supreme Court. His claims under the Eighth Amendment are legally meritless and should be dismissed as frivolous and/or for failure to state a claim for which relief can be granted pursuant to § 1915, § 1915A, and § 1997e. He therefore is not entitled to prospective injunctive relief related thereto against the defendants in their official capacities.

### 3.    The Policy does not Violate the Fourteenth Amendment

Gillet alleges that SMU Posted Policy No. 4 deprives him of the ability to receive packages and periodicals without affording him due process protections. Gillet, however, has not alleged that the policy imposes the type of punishment that would invoke additional due process protections. *Sandin*, 515 U.S. at 486.

In *Sandin*, the Supreme Court held that a prisoner's protected liberty interests are "generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 483-84 (internal citations omitted). The Court went on to hold that "[t]he Due Process Clause does not protect every change in the conditions of confinement having a substantial adverse impact on the prisoner." *Sandin*, 515 U.S. at 478; *Madison v. Parker*, 104 F.3d 765, 767-68 (5th Cir. 1997); *accord Hernandez v. Velasquez*, 522 F.3d 556, 563 (5th Cir. 2008); *Malchi v. Thaler*, 211 F.3d 953, 957-58 (5th Cir. 2000); *Dixon v. Hastings*, 117 Fed. Appx. 371, 2005 WL

17382, at *1 (5th Cir. 2005).  In keeping therewith, punishments and disciplinary restrictions, such as loss of recreation and commissary privileges and cell restriction, do not implicate due process concerns.  *See Malchi*, 211 F.3d at 958-59; *see also Madison*, 104 F.3d at 768.  The restrictions imposed on the level one and two SMU inmates, like Gillet, "did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest."  *Sandin*, 515 U.S. at 486.

"Prisoners held in lawful confinement have their liberty curtailed by definition, so the procedural protections to which they are entitled are more limited than in cases where the right at stake is the right to be free from confinement at all."  *Wilkinson v. Austin*, 545 U.S. 209, 225 (2005) (citations omitted).  Examples of prison hardships that would qualify as so atypical and significant as to implicate due process considerations include unwanted administration of anti-psychotic drugs, involuntary commitment to a mental hospital and extension of the prisoner's sentence for his underlying criminal conviction.  *Sandin*, 515 U.S. at 484; *Wilkinson*, 545 U.S. at 223-24.  Nothing of this magnitude is alleged here by Gillet.  The *Sandin* Court made clear that no particular process is required, unless something more than a mere change in condition of confinement occurs. *Madison*, 104 F.3d at 768.

Gillet has failed to allege a basis for his due process claims arising from the policy restricting his ability to receive packages and publications while on level one and two disciplinary segregation. His claims against the defendants in their individual capacities under the Fourteenth Amendment should be dismissed as frivolous and/or for failure to state a claim for which relief can be granted pursuant to § 1915(e), § 1915A, and § 1997e.  He also is not entitled to injunctive relief related thereto against the defendants in their official capacities.

Having established that the policy is not unconstitutional, Gillet's remaining claims against the individual defendants also must be dismissed as frivolous or for failure to state a claim for which relief can be granted for the following reasons.

**B.      Claims Against Linda Ramsay**

Gillet named Ramsay as a defendant in this case based on his assertion that she did not diligently or properly respond to his ARP appeal and denied him his Sixth Amendment right to a fair and impartial review of his ARP.[13]  He argued at the *Spears* Hearing that her resolution of his ARP appeal was made without real consideration of his arguments, and he should have been granted relief based on his recitation of the law.  The record indicates that Ramsay denied his ARP appeal for the following reasons:[14]

> Your request for an Administrative review of ARP# RCC-201 0-421 has been received.  A Corrections Specialist of the Headquarters staff has reviewed your request in order to render a fair and impartial response.
>
> The response provided is clear and concise, as well as has addressed your request appropriately. Per Offender Posted Policy #4, Special management Unit, "Offenders cannot receive packages or periodicals".  As such, this office concurs with staff and finds no further investigation warranted.
>
> Your request for relief is denied.

The right to file grievances complaints against prison officials fall under the First Amendment, not the Sixth Amendment as suggested by Gillet.  *See Noble v. Schmit*, 87 F.3d 157, 162 (6th Cir. 1996).  This right is protected, however, only if the underlying claim is not frivolous. *See Lewis v. Casey,* 518 U.S. 343, 353 n.3 (1996) ("Depriving someone of a frivolous claim . . .

---

[13]Rec. Doc. No. 1, p. 13, ¶3.

[14]Rec. Doc. No. 22-1, p. 2.

deprives him of nothing at all, except perhaps the punishment of Federal Rule of Civil Procedure 11 sanctions.")

In this case, as determined in this report, SMU Posted Policy No. 4 is not unconstitutional, and Gillet's claims in that regard are frivolous. He, therefore, did not have a non-frivolous claim before Ramsay in his ARP. In addition, Gillet was able to file and complete the grievance process at all steps, which was sufficient to comply with the First Amendment. He, therefore, has not alleged an infringement on his right to file a grievance complaint. He is simply dissatisfied with the result.

Inmates, however, have no constitutional right under the First or Fourteenth Amendments to an effective grievance procedure or to have his complaints resolved to his satisfaction. *See Propes v. Mays*, 169 Fed. Appx. 183, 184-85 (5th Cir. 2006); *Geiger v. Jowers*, 404 F.3d 371, 373-74 (5th Cir. 2005). The United States Supreme Court has made clear that the quality of a jail's grievance procedures is immaterial, and such procedures "need not meet federal standards, nor must they be plain, speedy, and effective." *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002) (quotation marks omitted); *see also Alexander v. Tippah County, Miss.*, 351 F.3d 626, 630 (5th Cir. 2003) ("[I]t is not for the courts to inquire whether administrative procedures satisfy minimum acceptable standards of fairness and effectiveness.").

In other words, there is no constitutional guarantee that the inmate will be satisfied with the responses given to his grievance complaints by the prison officials. Gillet was not entitled to the answer he wanted from Ramsay or any other official involved in the grievance process.

Gillet has failed to state a claim under § 1983 against Ramsay arising from the denial of his grievance appeal which resulted in the enforcement of SMU Posted Policy No. 4. The claims

against her also must be dismissed as frivolous and otherwise for failure to state a claim for which relief can be granted pursuant to § 1915(e) and § 1915A.

## C.     Secretary LeBlanc

Gillet alleged and testified at the *Spears* Hearing that he named Secretary LeBlanc as a defendant, because he is the head of DOC and should have known that his ARP appeal was not properly addressed by Ramsay and that the policy at issue was unconstitutional. Gillet also alleges that, since Ramsay was wrong in denying his ARP appeal, Secretary LeBlanc as her superior, must have failed in his duties to supervise and train her on how to properly respond to an ARP appeal.

Proof of an individual defendant's personal involvement in the alleged wrong is, of course, a prerequisite to his liability on the claim for damages under §1983. A state actor may be liable under § 1983 only if he "was personally involved in the acts causing the deprivation of his constitutional rights or a causal connection exists between an act of the official and the alleged constitutional violation." *Douthit v. Jones*, 641 F.2d 345 (5th Cir. 1981); *see also Watson v. Interstate Fire & Casualty Co.*, 611 F.2d 120 (5th Cir. 1980). For this reason, a supervisory official cannot be held liable pursuant to § 1983 under any theory of *respondeat superior* simply because an employee or subordinate allegedly violated the plaintiff's constitutional rights. *See Alton v. Texas A&M University*, 168 F.3d 196, 200 (5th Cir. 1999); *see also Baskin v. Parker*, 602 F.2d 1205, 1220 (5th Cir. 1979).

Secretary LeBlanc can not be held liable for the actions of his subordinates like Ramsay in this case. Even when specifically asked at the *Spears* Hearing, Gillet did not and could not allege that LeBlanc was personally involved in the review of his ARP or that he had knowledge of how Ramsay responded to the ARP appeal or the imposition of the policy at RCC. Gillet simply assumed

that LeBlanc should have known as the superior official. This type of vicarious liability is not sufficient to state a non-frivolous claim under § 1983.

In the alternative, supervisory liability may exist under § 1983 "without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation." *Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987). In the instant case, for the reasons already addressed above, SMU Posted Policy No. 4 is not unconstitutional. Gillet, therefore, has not pointed to an unconstitutional policy at RCC or one that resulted in the violation of his rights. This claim is also frivolous and fails to state a claim for which relief can be granted.

In addition, a supervising officer not personally involved in the acts that deprived the plaintiff of his constitutional rights also may be liable under § 1983 if: (1) the supervising officer failed to train or supervise the subordinate officers involved; (2) there is a causal connection between the alleged failure to supervise or train and the alleged violation of the plaintiff's constitutional rights; and (3) the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights. *Thompson v. Upshur County*, 245 F.3d 447, 459 (5th Cir. 2001) (citations omitted). Allegation and proof of a single instance, rather than a pattern of similar violations, normally will not sustain a plaintiff's claim that a lack of training or supervision caused a violation of his constitutional rights. *Id.* (citing *Snyder v. Trepagnier*, 142 F.3d 791, 798-99 (5th Cir.1998); *Thompkins*, 828 F.2d at 304-05). Finally, the inadequacy of the training "must be obvious and obviously likely to result in a constitutional violation ." *Id.* (citing *City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989)).

First, as discussed above, Gillet has not alleged a non-frivolous claim that any constitutional right was violated by Ramsay or any other defendants in connection with the policy or the ARP process. Without some alleged violation, there is no alleged error in the training or supervision that would be the basis for liability to enure to LeBlanc as a supervisor as the result of any action by Ramsay. For these reasons, Gillet has not alleged grounds to support either of the alternative grounds for supervisory liability.

The Court finds that Gillet's claims against Secretary LeBlanc, in his individual capacity, are frivolous and otherwise fail to state a claim for which relief can be granted pursuant to § 1915(e), § 1915A, and § 1997e. The claims should be dismissed.

### D.    Warden Tanner

Gillet also alleged and testified that he named Warden Tanner as a defendant, because as the RCC Warden, he should have known that SMU Posted Policy No. 4 was unconstitutional and because he did not properly instruct his subordinates on addressing his claims in the ARP grievance at the First Step.

As discussed in detail with respect to the Secretary LeBlanc, as a supervisor, Warden Tanner can not be held liable for the alleged constitutional violations of his subordinates. *See Alton*, 168 F.3d at 200. Gillet did not allege any personal involvement by Tanner in the actual review of his ARP, nor has he actually alleged any constitutional violation by Tanner's subordinates that could form the basis of a claim against him.

The Court notes that Gillet alleged at the *Spears* Hearing that he wrote letters to Tanner which would make him personally aware of his complaints about SMU Posted Policy No. 4. Assuming that Tanner was personally aware of the complaints, for the reasons discussed in detail

previously, Gillet has failed to establish that the policy was unconstitutional or in any way violative of his constitutional rights. He therefore has no basis to hold Tanner individually liable under § 1983 where there was no violation of a constitutional right.

As reported above, Gillet's only complaint is simply that he was denied relief at the first level of the ARP process, which he believes should have been granted. Gillet's disagreement with the resolution of his ARP complaint is not a sufficient allegation under § 1983. He has no constitutional right to be successful in the grievance process. *See Propes*, 169 Fed. Appx. at 184-85; *Geiger*, 404 F.3d at 373-74. His claims are frivolous and fail to state a claim for which relief can be granted under § 1983.

Gillet also has not alleged a basis of liability for Warden Tanner under either of the alternative theories applicable to a supervisor for enforcement of an unconstitutional policy or for failure to train or properly supervise. As discussed thoroughly above, the policy at issue, SMU Posted Policy No. 4, is not unconstitutional. Gillet also has not alleged any error in the training or supervision of any particular subordinate under Tanner that could possibly create a vicarious liability. He also has not alleged that any subordinate under Tanner committed a constitutional violation because of a lack of training or supervision.

The claims against the Warden, therefore, also are frivolous and otherwise fail to state a claim for which relief can be granted pursuant to § 1915(e), § 1915A, and § 1997e and should be dismissed for the reasons stated herein.

## IV. Recommendation

It is therefore **RECOMMENDED** that Gillet's § 1983 claims against the defendants, Secretary James M. LeBlanc, Linda Ramsay, and Warden Robert C. Tanner, in their official and

individual capacities, be **DISMISSED WITH PREJUDICE** as frivolous, for failure to state a claim for which relief can be granted, and/ or for seeking relief against an immune defendant pursuant to 28 U.S.C. §§ 1915(e), 1915A, and 42 U.S.C. § 1997e as applicable.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation **within fourteen (14) days** after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996).[15]

New Orleans, Louisiana, this 28th day of March, 2012.

**KAREN WELLS ROBY**
**UNITED STATES MAGISTRATE JUDGE**

---

[15]*Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.